**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DELORIS JOHNSON and BRYAN LEVINE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PAYLOGIX LLC,<br><br>Defendant. | Case No. 1:26-cv-05184<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Deloris Johnson and Bryan Levine ("Plaintiffs"), individually and on behalf of all others similarly situated (collectively, "Class Members"), by and through their attorneys, bring this Class Action Complaint against Defendant Paylogix LLC ("Paylogix" or "Defendant"), and complain and allege upon personal knowledge as to themselves and information and belief as to all other matters.

## INTRODUCTION

1. Plaintiffs bring this class action against Paylogix for its failure to secure and safeguard the personally identifiable information ("PII") and personal health information ("PHI") of its clients' customers and employees (including Plaintiffs), including names, date of birth, Social Security number, and voluntary benefit information, and for some, access credentials, electronic signature, financial account information, health insurance information, medical information, passport number, taxpayer identification number, and US alien identification number.

2. Paylogix is a third-party administrator for voluntary benefits headquartered in Westbury, NY.

3. Between November 13, 2025, and November 18, 2025, an unauthorized third party gained access to Paylogix's network systems and obtained files containing the PII/PHI[1] of Paylogix's clients' customers or employees, including Plaintiffs (the "Data Breach").

4. Paylogix owed a duty to Plaintiffs and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. Paylogix breached this duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect its clients' customers' or employees' PII/PHI from unauthorized access and disclosure.

5. As a result of Paylogix's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiffs' and Class Members' PII/PHI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiffs bring this action on behalf of themselves and all persons whose PII/PHI was exposed as a result of the Data Breach.

6. Plaintiffs, on behalf of themselves and all other Class Members, assert claims for negligence and negligence per se, and seek declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

***Plaintiff Deloris Johnson***

7. Plaintiff Deloris Johnson is a citizen of South Carolina.

8. Plaintiff Johnson is unaware of how Paylogix obtained her PII/PHI.

9. At all relevant times Paylogix stored and maintained Plaintiff Johnson's PII/PHI on its network systems, including the systems accessed in the Data Breach.

---

[1] The use of PII/PHI means both PII and PHI or PII or PHI individually.

10. Plaintiff Johnson received notice from Paylogix that her PII/PHI was affected in the Data Breach.

11. Following the Data Breach, Plaintiff Johnson has experienced a significant increase in the number of spam calls, texts, and emails she receives. This includes text messages about completing loan applications that she did not start.

12. As a direct result of the Data Breach, Plaintiff Johnson has suffered injury and damages including, *inter alia*, a substantially increased and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII/PHI; deprivation of the value of her PII/PHI; and lost time mitigating the effects of the Data Breach.

***Plaintiff Bryan Levine***

13. Plaintiff Bryan Levine is a citizen of Pennsylvania.

14. Plaintiff Levine is unaware of how Paylogix obtained his PII/PHI.

15. At all relevant times Paylogix stored and maintained Plaintiff Levine's PII/PHI on its network systems, including the systems accessed in the Data Breach.

16. Plaintiff Levine received notice from Paylogix that his PII/PHI was affected in the Data Breach.

17. Following the Data Breach, Plaintiff Levine has experienced several fraudulent charges on credit cards that he has used to pay for insurance/medical expenses. These attempted fraudulent transactions include an attempt to purchase approximately $18,000 worth of NBA Finals tickets in or about June of 2026, and approximately $300 of fraudulent charges in or about August of 2026.

18. Plaintiff Levine has experienced an increase in the number of spam calls and texts he receives since the Data Breach.

19. Plaintiff Levine has lost valuable time dealing with the Data Breach and mitigating harm, including reviewing his accounts, dealing with fraud, and replacing his cards.

20. As a direct result of the Data Breach, Plaintiff Levine has suffered injury and damages including, *inter alia*, a substantially increased and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of his highly sensitive PII/PHI; deprivation of the value of his PII/PHI; and lost time mitigating the effects of the Data Breach.

***Defendant Paylogix LLC***

21. Defendant Paylogix LLC is a New York limited liability company with its principal place of business at 1025 Old Country Road #310, Westbury, NY.

## JURISDICTION AND VENUE

22. The Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

23. This Court has personal jurisdiction over Defendant because it has its principal place of business in New York.

24. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Defendant's principal place of business is in this District and a significant amount of the events leading to Plaintiffs' causes of action occurred in this District.

# FACTUAL ALLEGATIONS

### ***Overview of Paylogix***

25. Paylogix was founded in 1995 and provides third-party administration services of voluntary benefits.[2] The company claims to be "experts in insurance and voluntary benefits."[3]

26. In the regular course of its business, Paylogix collects and maintains the PII/PHI of its clients' customers or employees.

27. On its website, Paylogix claims, "[w]e recognize that it is a vital obligation when clients entrust us with their data. In order to protect client data, we are committed to secure and reliable client application operations."[4] It also claims that "[y]our data is secure" and that it "take[s] security seriously."[5]

28. Plaintiffs and Class Members are persons whose PII/PHI Paylogix obtained while providing services to its clients.

### ***The Data Breach***

29. Between November 13, 2025, and November 18, 2025, an unauthorized third party gained access to Paylogix's network systems.[6] After an investigation, Paylogix determined that files were accessed and copied in the Data Breach and that the compromised data included PII/PHI, including that of Plaintiffs and Class members. Paylogix identifies the following categories of PII/PHI impacted in the Data Breach: "date of birth, Social Security number, and voluntary benefit

---

[2] *About Paylogix*, Paylogix, https://www.paylogix.com/about-paylogix/ (last visited Aug. 21, 2026).
[3] *Id.*
[4] *Policies and Legal Notices*, Paylogix, https://www.paylogix.com/about-paylogix/policies-and-terms (last visited Aug. 21, 2026).
[5] *Id.*
[6] *Notice of Data Event*, Paylogix, https://www.paylogix.com/wp-content/uploads/2026/08/Paylogix-LLC-Notice-of-Potential-Data-Event.pdf (last visited Aug. 21, 2026).

information. In limited circumstances, it also involved access credentials, electronic signature, financial account information, health insurance information, medical information, passport number, taxpayer identification number, and US alien identification number."[7]

30. Akira, a ransomware group, reported to have perpetrated the Data Breach, posting that it had stolen 185 gigabytes of data from Paylogix on January 15, 2026.[8] The ransomware group stated, "We will upload 185gb of corporate data soon."[9] Akira is a known ransomware group and the United States Cybersecurity and Infrastructure Security Agency maintains a page regarding the group's methods for perpetrating ransomware attacks.[10]

31. Despite the Data Breach occurring between November 13, 2025, and November 18, 2025, Paylogix did not begin notifying Plaintiffs and Class Members of the Data Breach until in or about August of 2026, approximately nine months after the Data Breach occurred.[11] Paylogix's failure to promptly notify Plaintiffs and Class Members that their PII/PHI was accessed and stolen virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse, or disseminate that PII/PHI before Plaintiffs and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiffs and Class Members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

---

[7] *Id.*

[8] *Akira Targets Insuretech Leader Paylogix in Major Ransomware Attack*, DeXpose, https://www.dexpose.io/akira-targets-insuretech-leader-paylogix-in-major-ransomware-attack/ (last visited Aug. 21, 2026).

[9] *Id.*

[10] *#StopRansomware: Akira Ransomware*, CISA, https://www.cisa.gov/news-events/cybersecurity-advisories/aa24-109a (last visited Aug. 21, 2026).

[11] *Id.*

***Defendant Knew that Criminals Target PII/PHI***

32. At all relevant times, Paylogix knew, or should have known, that the PII/PHI that it collected and stored was a target for malicious actors. Despite such knowledge, Paylogix failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiffs' and Class members' PII/PHI from cyberattacks that it should have anticipated and guarded against.

33. It is well known among companies that store sensitive personally identifying information that such information—such as the PII/PHI stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[12]

34. Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2025 report, Kroll found that "the healthcare industry was the most breached" in 2024.[13] The company found that 23% of the breaches it handled responses for were from the healthcare industry, up from 18% in 2023.[14]

---

[12] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[13] *Data Breach Outlook*, KROLL, https://www.kroll.com/en/insights/publications/cyber/data-breach-outlook-2025 (last visited Aug. 21, 2026).

[14] *See id*.

35. PII/PHI is a valuable property right.[15] The value of PII/PHI as a commodity is measurable.[16] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[17] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[18] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

36. Criminals piece together bits and pieces of compromised PII/PHI for profit by creating "Fullz" packages. "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, Social Security number, date of birth, and more.

37. With "Fullz" packages, cyber-criminals can cross-reference two sources of PII/PHI to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

38. The development of "Fullz" packages means that the stolen PII/PHI from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain

---

[15] *See* Marc van Lieshout, *The Value of Personal Data*, 457 Int'l Fed'n for Info. Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[16] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, Medscape (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[17] Organization for Economic Co-operation and Development, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD iLibrary (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[18] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, Interactive Advert. Bureau (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

information such as emails, phone numbers, or credit card numbers may not be included in the PII/PHI that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over again.

39. Thus, even if certain information (such as contact information) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to criminals.

40. As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security numbers, PII/PHI, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

41. PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[19] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[20]

42. All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security numbers, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to

---

[19] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HealthTech Mag. (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").
[20] *Id.*

$1,300 each on the black market.[21] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[22]

43. Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[23] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[24]

44. Consumers rightly place a high value on the privacy of their data. Researcher sheds light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[25]

45. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

---

[21] *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAG. (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

[22] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[23] Steager, *supra* note 19.

[24] *Id.*

[25] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22 Info. Sys. Rsch. 254 (2011) https://www.jstor.org/stable/23015560?seq=1.

***Theft of PII/PHI Has Grave and Lasting Consequences for Victims***

46. Theft of PII/PHI can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII/PHI to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[26] [27]

47. Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[28]

48. Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[29]

49. Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records

---

[26] *See* Federal Trade Commission, *What to Know About Identity Theft*, FTC Consumer Info., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last visited Aug. 21, 2026).

[27] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[28] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, Experian (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[29] Identity Theft Resource Center, *2025 Consumer Impact Report*, Identity Theft Res. Ctr. (2025), https://www.idtheftcenter.org/publication/itrc-2025-consumer-impact-report/ (last visited Aug. 21, 2026).

that can plague victims' medical and financial lives for years."[30] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[31] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care."[32] The FTC also warns, "If the thief's health information is mixed with yours it could affect the medical care you're able to get or the health insurance benefits you're able to use."[33]

50. A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

a. Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

b. Significant bills for medical goods and services neither sought nor received.

c. Issues with insurance, co-pays, and insurance caps.

d. Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

e. Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

f. As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

---

[30] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, World Priv. F. (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.
[31] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk . . .*, *supra* note 22.
[32] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, FTC Consumer Info., https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last visited Aug. 21, 2026).
[33] *Id.*

g. Phantom medical debt collection based on medical billing or other identity information.

h. Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own. [34]

51. There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[35]

52. It is within this context that Plaintiffs and all other Class Members must now live with the knowledge that their PII/PHI is forever in cyberspace and was specifically targeted and taken by someone intending to use that information for any number of improper purposes, fraud, and scams, including making the information available for sale on the black market.

***Damages Sustained by Plaintiffs and Class Members***

53. Plaintiffs and Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendant's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach.

[34] *See* Dixon & Emerson, *supra* note 30.

[35] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. of Systemics, Cybernetics and Informatics 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

## CLASS ALLEGATIONS

54. This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

55. Plaintiffs bring this action on behalf of themselves and all members of the following Class of similarly situated persons:

> All persons whose personally identifiable information and/or personal health information was accessed and disclosed in the Data Breach to unauthorized persons, including all persons who were sent a notice of the Data Breach.

56. Excluded from the Class are Paylogix LLC, and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge(s).

57. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

58. The members in the Class are so numerous that joinder of each of the Class Members in a single proceeding would be impracticable. On information and belief, the number of Class Members is in the thousands.

59. Common questions of law and fact exist as to all Class Members and predominate over any potential questions affecting only individual Class Members. Such common questions of law or fact include, *inter alia*:

a. Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiffs' and Class Members' PII/PHI from unauthorized access and disclosure;

b. Whether Defendant had a duty not to disclose the PII/PHI of Plaintiffs and Class Members to unauthorized third parties;

c. Whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiffs' and Class Members' PII/PHI;

d. Whether Defendant breached its duties to protect Plaintiffs' and Class Members' PII/PHI; and

e. Whether Plaintiffs and Class Members are entitled to damages and the measure of such damages and relief.

60. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and all other Class Members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

61. Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like all proposed members of the Class, had their PII/PHI compromised in the Data Breach. Plaintiffs and Class Members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiffs' claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class Members.

62. Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs are adequate representatives of the Class in that they have no interests adverse to, or that conflict with, the Class they seek to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

63. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiffs and Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class Members to individually seek redress from Defendant's wrongful conduct. Even if Class

Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

64. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

65. Paylogix owed a duty to Plaintiffs and Class Members to exercise reasonable care in safeguarding and protecting the PII/PHI in its possession, custody, or control.

66. Paylogix knew or should have known the risks of collecting and storing Plaintiffs' and all other Class members' PII/PHI and the importance of maintaining secure systems. Paylogix knew or should have known of the many data breaches that targeted businesses that collect and store PII/PHI in recent years.

67. Given the nature of Paylogix's business, the sensitivity and value of the PII/PHI it maintains, and the resources at its disposal, Paylogix should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring.

68. Paylogix breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to it—including Plaintiffs' and Class Members' PII/PHI.

69. It was reasonably foreseeable to Paylogix that its failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiffs' and Class Members' PII/PHI to unauthorized individuals.

70. But for Paylogix's negligent conduct or breach of the above-described duties owed to Plaintiffs and Class Members, their PII/PHI would not have been compromised.

71. As a result of Paylogix's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs and Class Members have suffered and will continue to suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort spent attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Paylogix's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach.

**COUNT II**
**NEGLIGENCE PER SE**

72. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

73. Defendant's duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164,

Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

74. Defendant's duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to employ reasonable measures to protect and secure PII/PHI.

75. Defendant violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiffs' and all other Class Members' PII/PHI and not complying with applicable industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII/PHI it obtains and stores, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiffs and the other Class members.

76. Defendant's violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA constitute negligence per se.

77. Plaintiffs and Class Members are within the class of persons that HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

78. The harm occurring as a result of the Data Breach is the type of harm HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against.

79. It was, or should have been, reasonably foreseeable to Defendant that its failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and

software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiffs' and Class Members' PII/PHI to unauthorized individuals.

80. The injury and harm that Plaintiffs and the other Class Members suffered was the direct and proximate result of Defendant's violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA. Plaintiffs and Class Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort expended attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Paylogix's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach.

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of all other members of the Class, respectfully request that the Court enter judgment in their favor and against Defendant as follows:

A. certifying the Class as requested herein, designating Plaintiffs as Class Representative, and appointing Plaintiffs' counsel as Class Counsel;

B. awarding Plaintiffs and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C. awarding Plaintiffs and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiffs, on behalf of themselves and the Class, seek appropriate injunctive relief designed to prevent Defendant from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide

or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D. awarding Plaintiffs and the Class pre-judgment and post-judgment interest to the maximum extent allowable under law;

E. awarding Plaintiffs and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. awarding Plaintiffs and the Class such other favorable relief as allowable under law.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

Dated: August 21, 2026

Respectfully submitted,

/s/ *Adam Pollock*
Adam Pollock
Anna Menkova
**POLLOCK COHEN LLP**
111 Broadway, Suite 1804
New York, NY 10006
Tel: 212-337-5361
adam@pollockcohen.com
anna@pollockcohen.com

Ben Barnow (NY Bar No. 2253391)
Anthony L. Parkhill*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Ste. 1630
Chicago, IL 60606
Tel: 312-621-2000
Fax: 312-641-5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

*Counsel for Plaintiffs*
**pro hac vice forthcoming*